1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**EASTERN DISTRICT OF CALIFORNIA**

10

11   HEIDI RUBEL and OLGA MALYSHEVA, on
     behalf of themselves and others similarly situated,

12                    Plaintiffs,

13            v.

14

15   U.S. NURSING CORPORATION; FASTAFF,
     LLC; and DOES 1-20,

16
                      Defendants.
17

18

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.: 1:23-cv-1664 JLT CDB

ORDER DENYING PLAINTIFF'S MOTION
TO REMAND

(Docs. 4, 13)

19        Heidi Rubel and Olga Malysheva were employed as traveling nurses by U.S. Nursing

20   Corporation and Fastaff, LLC, and were assigned to work in California. Plaintiffs seek to hold

21   Defendants liable for violations of California's wage and labor laws, including those related to failure

22   to pay for all hours worked, overtime wages, minimum wages, meal breaks, rest breaks, and wages

23   due after employment ends. Plaintiffs initiated this action by filing a complaint, on behalf of

24   themselves and others, in Kern County Superior Court. (Doc. 1-1[1].) Defendants removed the action

25   to this Court under the Class Action Fairness Act, 28 U.S.C. § 1332(d). (Doc. 1.) Plaintiffs request a

26

27   _____

28   [1] The Notice of Removal contains two identical copies of the complaint, due to the separate service on the defendants.
     (Doc. 1-1 [served upon Fastaff] and Doc. 1-2 [served upon U.S. Nursing Corporation].) For the sake of clarity, the
     Court cites only to one document.

remand to the state court, asserting Defendants fail to show by a preponderance of the evidence that the amount in controversy requirement of CAFA is satisfied. (Doc. 4.) Defendants maintain the Court has jurisdiction under CAFA. (Doc. 9.) For the reasons below, the motion to remand is **DENIED**.

## I.     Background

Plaintiffs assert that "Defendants U.S. Nursing Corporation and Fastaff, LLC are both staffing agencies in the healthcare industry." (Doc. 1-1 at 7, ¶ 8.) Plaintiffs were both employed as travel nurses by Defendants. (*Id.* at 8, ¶¶ 12-13.) Rubel was a resident of Georgia and was hired "to work travel assignments as an hourly-paid, non-exempt Registered Nurse throughout California," beginning around March 2021. (*Id.* at 7-8, ¶¶ 6, 12.) Rubel most recently worked at Adventist Health Bakersfield from approximately June 27, 2022 to September 24, 2022. (*Id.* at 8, ¶ 12.) Plaintiffs report that "Rubel resigned from her employment with Defendants" in October 2023. (*Id.*) Malysheva was a nurse and resident of Texas, also hired by Defendants "to work travel assignments as an hourly-paid, non-exempt Registered Nurse throughout California," starting around August 2021. (*Id.* at 7-8, ¶¶ 7, 13.) Malysheva was "initially assigned … to work an assignment at Adventist Health Bakersfield facility in Bakersfield, California from approximately August 23, 2021 to December 11, 2021." (*Id.* at 8, ¶ 13.) Plaintiffs report Defendants also assigned "Malysheva to work another assignment at USN Crisis Sutter Health - Eden Medical Center in Castro Valley, California from approximately June 27, 2022 to July 30, 2022." (*Id.*)

Plaintiffs allege that "Defendants, from time to time, failed to pay overtime rates for all overtime hours worked by Plaintiffs and other non-exempt employees." (Doc. 1-1 at 9, ¶ 15.) For example, Plaintiffs assert that during the pay period including December 18 to December 24, 2022, "Malysheva's overtime hours were paid at an overtime rate of $124.47, which is not the correct overtime rate as her then hourly rate was $109." (*Id.*)

In addition, Plaintiffs assert Defendants "had a practice of failing to include the value of their 'travel stipends,' including meals, incidentals, and lodging, whether paid in cash or in kind, in Plaintiffs' and other non-exempt employees' regular rates of pay when calculating overtime or double time wages." (Doc. 1-1 at 9, ¶ 17.) Plaintiffs report:

> [P]ursuant to Plaintiff Rubel's employment agreement for the Adventist Health Bakersfield facility assignment, titled "Assignment Agreement

2

Letter," Defendants provided "housing stipend will be $80.00 per day for the length of your assignment." However, Plaintiff Rubel's employment agreement also stated, "You are not eligible for a stipend on a day that you are absent for an entire scheduled or requested shift for personal reasons," thereby making the promised travel stipends adjustable based on the amount of work performed. Plaintiff Malysheva's employment agreement for the USN Crisis Sutter Health - Eden Medical Center assignment, also titled "Assignment Agreement Letter," also contained similar language: "housing stipend will be $189.00 per day for the length of your assignment... You are not eligible for a stipend on a day that you are absent for an entire scheduled or requested shift for personal reasons."

(*Id.* at 9-10, ¶ 17.)  Plaintiffs also report the "travel stipends" are included in their wage statements. (*Id.* at 10, ¶ 17.)  According to Plaintiffs, the "travel stipends are not intended to reimburse their employees for their travel expenses, but are, in fact, a form of disguised wages."  (*Id.*, ¶ 18 [internal quotation marks omitted].)  Plaintiffs contend the practice of not including the travel stipends to calculate overtime pay rates was a "violation of California law."  (*Id.*)

Plaintiffs also allege that "from time to time," Defendants committed other pay violations. (Doc. 1-1 at 10-11, ¶¶ 19-23.)  For example, Plaintiffs contend Defendants improperly calculated overtime rates when they "failed to include earned on-call [pay] as part of their employees' regular rates of pay in determining their overtime or double-time pay."  (*Id.* at 10, ¶ 19.)  In addition, Plaintiffs assert Defendants failed "to pay for all hours worked," including rounding time worked and requiring employees—including Plaintiffs—to "complete training/orientation courses (or modules), which are client-specific, without compensating them for such time."  (*Id.* at 11, ¶¶ 20, 22 [emphasis omitted].)  Further, Plaintiffs allege they suffered meal and rest break violations "from time to time," stating:

Defendants, from time to time, have not authorized and/or permitted their non-exempt employees, including Plaintiffs, to take lawful meal or rest breaks under California law, and have also failed to pay the break premiums owed to them under California law. In particular, from time to time, Plaintiffs and other non-exempt employees received short, late, interrupted, and/or no meal or rest breaks due to, among other reasons, work overload and staffing shortages.

(*Id.*, ¶ 23; *see also id.* at 17-18, ¶¶ 56-57, 63-64.)

Plaintiffs contend they "were required to use mobile phones for work purposes for, among other things, submitting their work hours to Defendants and for communicating with Defendants about their work."  (Doc. 1-1 at 11-12, ¶ 24.)  Plaintiffs assert the use of their mobile phones should have been reimbursed under California law as necessary business expenditures "incurred as a direct consequence

3

of their duties" and "Defendants, from time to time, have not reimbursed their non-except employees." (*Id.* at 11; *id.* at 19, ¶¶ 68-70.)

According to Plaintiffs, Defendants did not "furnish accurate wage statements." (Doc. 1-1 at 20 [emphasis omitted].) Plaintiffs observe that Labor Code § 226(a) requires statements to show the total hours worked, "all applicable hourly rates in effect during the pay period," "the corresponding number of hours worked at each hourly rate," gross wages earned, and net wages earned. (*Id.*, ¶ 72.) However, Plaintiffs allege that "from time to time," Defendants "knowingly and intentionally failed to provide … paycheck deduction statements accurately displaying the information required by Labor Code §226(a)." (*Id.*, ¶ 74.)

Finally, Plaintiffs allege that Defendants owe waiting time penalties to departed employees. (Doc. 1-1 at 21.) Plaintiffs report, "During the applicable recovery period, Plaintiff Rubel and many members of the Class have separated from Defendants as a result of being discharged or having voluntarily resigned their employment." (*Id.*, ¶¶ 79, 80.) Plaintiffs contend, "Defendants failed to pay all wages due to the Plaintiff Rubel and some of the members of the Class who separated from Defendants." (*Id.*, ¶ 81.) Plaintiffs assert that "Defendants are required to compensate these employees for all their unpaid wages earned and an additional penalty equal to the daily earnings of such employees up to an amount equal to those owed for 30 days of work." (*Id.*) Plaintiffs clarify they "do[] not allege that all separated members of the Class are owed waiting time penalties or that they are owed the full 30-day penalty under Labor Code § 203, because it is unknown … whether Defendants paid some of the separated members of the Class all their owed wages upon separation or paid them all their owed wages less than 30 days after their separation." (*Id.*)

Based upon these allegations, Plaintiff filed a complaint in Kern County Superior Court, stating the following claims: (1) unpaid overtime, (2) failure to pay wages for all hours worked, (3) failure to pay minimum wage, (4) failure to authorize and/or permit meal breaks, (5) failure to authorize and/or permit rest breaks, (6) unreimbursed busines expenses, (7) failure to provide accurate wage statements, (8) final wages not timely paid, and (9) unfair business practices. (Doc. 1-1 at 5; *id.* at 14-22.) Plaintiffs indicated these claims were brought on behalf of a class including: "[a]ll of Defendants' non-exempt employees who were assigned to work at any facility inside California during the Class Period,

with the exception of non-exempt employees of Defendants who were assigned to work at facilities in California that at the time were engaged in labor disputes." (*Id.* at 12, ¶ 29.) The total amount in controversy is not specified, though Plaintiffs indicated on the Civil Case Cover Sheet and complaint that the "amount demanded exceeds $25,000." (*Id.* at 5 [emphasis omitted]; *id.* at 25.)

Defendants removed the action to this Court, asserting in the Notice of Removal that the federal court has original jurisdiction pursuant to the Class Action Fairness Act. (Doc. 1.) Defendants assert the parties are diverse, because Plaintiffs are residents of Georgia and Texas, while U.S. Nursing and Fastaff are deemed residents of Colorado. (*Id.* at 5-6, ¶¶ 10-13.) Defendants report the company records show "more than 2,300 non-exempt employees who have worked for Fastaff on one or more client assignments in California between October 20, 2019 and November 25, 2023." (*Id.* at 7, ¶ 14.) Defendants acknowledge Plaintiffs' allegations concerning failure to include travel stipends in calculating pay, and admit that as "a policy," "Fastaff does not include housing stipends in the calculation of employees' regular rate of pay for purposes of calculating and paying overtime because the housing stipends are properly excludable from the regular rate." (*Id.* at 11, ¶¶ 25-26.) Defendants report "data shows that between October 20, 2019 and May 27, 2023, approximately 1,330 non-exempt employees of Fastaff who worked on an assignment in California received overtime and/or double-time wage payments for a workweek *and* a housing stipend in the same workweek." (*Id.* at 12, ¶ 28 [footnote omitted, emphasis in original].) Defendants contend:

> Using the amount of these non-exempt employees' actual housing stipends (divided by 40 hours to calculate an alleged hourly regular rate for the stipend), and their overtime and double-time hours worked in those workweeks, Fastaff calculated that Plaintiff's unpaid overtime claim based on the regular rate theory places in controversy at least $6,500,000 in alleged unpaid overtime and double-time wages.

(*Id.* at 12 [emphasis omitted].) Thus, Defendants contend the amount in controversy requirement is satisfied with the unpaid overtime wage claim alone. (*Id.*) Nevertheless, Defendants assert the claim for wage statement violations puts $437,800 in controversy, and the claim for waiting time penalties— for 71 employees whose employment ended during the relevant period— puts an additional $1,322,400 in controversy. (*Id.* at 12-14, ¶¶ 30-38.) Defendants contend an award of "reasonable attorneys' fees" in the amount of 25% may also be assumed, which adds $1,734,450 to the amount in

controversy. (*Id.* at 16, ¶¶ 41-43.) In total, Defendants calculate that the amount in controversy is at least $9,994,650. (*Id.*, ¶ 44.)

Plaintiffs request the action be remanded to state court, asserting that Defendants relied "on unfounded, self-serving assumptions, in addition to furtive and faulty calculations" in the Notice of Removal. (Doc. 4 at 6.) Plaintiffs contend the evidence in support of removal is deficient and the amount in controversy is not satisfied. (*Id.* at 10-18.) Defendants oppose remand and provided additional calculations—based on updated evidence and assumptions—to show the amount in controversy exceeds the jurisdictional minimum (Doc. 8), to which Plaintiffs filed a brief in reply. (Doc. 10.)

## II.    Leave to file Sur-Reply

Defendants filed an ex parte application to file a sur-reply, which contains modified calculations supported by a supplemental declaration from Fastaff's Payroll Director. (Doc. 13 at 2; *see also* Doc. 13-2.) Plaintiffs object to the application, asserting the request "is nothing more than improper attempt to correct their flawed overtime estimate…" (Doc. 14 at 3.)

Notably, "[n]either the Local Rules nor the Federal Rules provide the right to file a surreply." *Kamali v. Stevens*, 2022 WL 2119024, *1 (E.D. Cal. June 11, 2022). Nevertheless, "district courts have the discretion to either permit or preclude a surreply." *Garcia v. Biter*, 195 F. Supp. 3d 1131, 1134 (E.D. Cal. 2016) (citing *U.S. ex rel. Meyer v. Horizon Health Corp.*, 565 F.3d 1195, 1203 (9th Cir. 2009)). Leave to file a surreply is appropriate where new arguments or evidence is raised in a reply. *See Garcia*, 195 F. Supp. 3d at 1134 (indicating a surreply may be permitted where "new issues or arguments" or "new evidence" is raised in a reply brief); *Kamali*, 2022 WL 2119024, at *1 ("new arguments in [a] reply brief" constitute "a valid reason" for the filing of a surreply [citation omitted]).

Defendants filed an ex parte application to file a sur-reply, noting that "the Reply asserts for the first time that the proper methodology for calculating the amount in controversy on Plaintiffs' regular rate overtime claim requires using a .5 multiplier for overtime and a 1.0 multiplier for double time." (Doc. 13 at 2 [emphasis omitted]) Defendants observe that in the Reply, Plaintiffs suggest Defendants agreed to these multipliers, and assert this was false. (*Id.*, citing Doc. 10 at 3.) Defendants submit new calculations that adopt the multipliers identified by Plaintiffs, to show that even if the multipliers are

changed, the amount in controversy requirement is satisfied. (*Id.* at 3.) Plaintiffs object to the application, asserting the request "is nothing more than improper attempt to correct their flawed overtime estimate…." (Doc. 14 at 3.)

In the Notice of Removal, Defendants indicated: "Based on Plaintiffs' allegations and Fastaff's policy, Fastaff may reasonably calculate the amount put in controversy by this particular theory of Plaintiffs' unpaid overtime claim based on every pay period within the alleged limitations during which putative class members earned and received overtime and/or double-time wages and a housing stipend." (Doc. 1 at 11, ¶ 27.) Defendants report that "between October 20, 2019 and May 27, 2023, approximately 1,330 non-exempt employees of Fastaff who worked on an assignment in California received overtime and/or double-time wage payments for a workweek *and* a housing stipend in the same workweek." (*Id.* at 12, ¶ 28 [emphasis in original, footnote omitted].) Defendants report they used "the amount of these non-exempt employees' actual housing stipends (divided by 40 hours to calculate an alleged hourly regular rate for the stipend), and their overtime and double-time hours worked in those workweeks, Fastaff calculated that Plaintiff's unpaid overtime claim based on the regular rate theory places in controversy at least $6,500,000 in alleged unpaid overtime and double-time wages." (*Id.*, emphasis omitted.)

Seeking remand, Plaintiffs asserted that Defendants "relie[d] on unfounded, self-serving assumptions, in addition to furtive and faulty calculations, to reach the $5 million amount in controversy required under the Class Action Fairness Act." (Doc. 4 at 6.) For example, Plaintiffs challenged the "use of 100% violation rates for each of Plaintiffs' claims," including for calculating damages for the overtime claim. (*Id.*; *see also id.* at 10-12.) Plaintiffs also asserted Defendants erred in using a 40-hour week to calculate the overtime. (*Id.* at 12-13.) According to Plaintiffs, the lack of evidence and information resulted in the inability to "discern whether Defendant used a proper methodology, or even proper math" to estimate the amounts in controversy for the overtime claim. (*Id.* at 12-13.) After Defendants filed their opposition to remand, Plaintiffs argued that Defendants made "a fatal error" in calculating overtime damages, because "Defendants use the wrong multiplier of 1.5 to calculate unpaid overtime and the wrong multiplier of 2 to calculate unpaid double time." (Doc. 10 at 2; *see also id.* at 3-6.) Plaintiffs also renewed the argument that "this overtime estimate is based on

undisclosed underlying figures that do not allow Plaintiffs or this Court to assess its accuracy, including even the accuracy of its math." (*Id.*)  Plaintiffs maintain, "This falls far short of the summary-judgment-type evidence Defendants were required to present to establish federal jurisdiction." (*Id.* at 2.)  Plaintiffs assert, "because the parties have agreed to use actual hours worked as the denominator for estimating overtime damages and Defendants' calculation under that method is incorrect, the case must be remanded on that basis alone since even if Defendants' other calculations and assumptions are given full credit, they are still not sufficient to reach the \$5 million threshold." (*Id.* at 6.)

Significantly, Plaintiffs did not raise the issue of multipliers in the motion to remand.  Although Plaintiffs questioned other aspects of the calculation—such as the 40-hour workweek and the 100 percent violation rate—Plaintiffs did not make mention of the multipliers they believed were appropriate for calculating the unpaid overtime and double-time.  Thus, it appears the legal arguments in the reply are new, such that a response is appropriate.  *See, e.g., Salazar v. Avis Budget Grp.*, 2007 WL 9776748, at *4 (S.D. Cal. May 8, 2007) (indicating that "[t]he Court properly considered the new evidence presented with [the] defendants opposition and surreply brief" to determine whether the court had diversity jurisdiction under CAFA).  Even if Defendants did not submit additional evidence using the multipliers identified by Plaintiffs, the Court would be entitled to order Defendants to provide additional information to assist in the analysis regarding the amount in controversy.  *See, e.g., Jauregi v. Road Runner Transp. Servs.*, 28 F.4th 989, 995-96 (9th Cir. 2022) (indicating that when a defendant's amount in controversy calculation should be rejected for using an improper assumption, the district court should "not just zero-out the claim" but instead consider a new calculation with "a better assumption" for the claim); *see also Rhinehart v. Genworth Life & Annuity Ins. Co.*, 2019 WL 295770, at *3 (E.D. Cal. Jan. 23, 2019) (considering information provided in a supplemental declaration from the defendant to determine whether the Court had jurisdiction under CAFA, after the Court ordered additional information be provided).

Given the new argument raised by Plaintiffs and that additional evidence will assist the Court in its analysis, the Court exercises its discretion to grant the Defendants' request.  *See Vizcarra v. Unilever United States*, 339 F.R.D. 530, 537 n.1 (N.D. Cal. 2021) (granting leave to file a surreply "because the Court finds that the sur-reply would assist its resolution of the issues presented in the

1    motions before it"); *see also Jauregi*, 28 F.4th at 995-96.  Therefore, the sur-reply and supporting

2    documents (Doc. 13-1 and Doc. 13-2) are deemed filed and will be considered by the Court.

3    **III.    Jurisdiction**

4           A suit filed in a state court may be removed to the federal court if the court would have original

5    jurisdiction over the suit.  28 U.S.C. § 1441(a); *see also Libhart v. Santa Monica Dairy Co.*, 592 F.2d

6    1062, 1064 (9th Cir. 1979) ("The removal jurisdiction of the federal courts is derived entirely from the

7    statutory authorization of Congress.").  Courts have original jurisdiction—or federal question

8    jurisdiction—of all civil actions arising under the Constitution, laws, or treaties of the United States.

9    28 U.S.C. § 1331.

10          **A.    Class Action Fairness Act**

11          Under the Class Action Fairness Act, federal courts have original jurisdiction "over certain class

12   actions, defined in [28 U.S.C.] § 1332(d)(1), if the class has more than 100 members, the parties are

13   minimally diverse, and the amount in controversy exceeds $5 million."  *Dart Cherokee Basin*

14   *Operating Co., LLC v. Owens*, 574 U.S. 81, 84-85 (2014) (citing *Standard Fire Ins. Co. v. Knowles*,

15   568 U.S. 588, 592 (2013)).  "Congress enacted CAFA to 'curb perceived abuses of the class action

16   device which, in the view of CAFA's proponents, had often been used to litigate multi-state or even

17   national class actions in state courts.'"  *Singh v. Am. Honda Fin. Corp.*, 925 F.3d 1053, 1067 (9th Cir.

18   2019) (quoting *United Steel v. Shell Oil Co.*, 602 F.3d 1087, 1090 (9th Cir. 2010)).  The Supreme Court

19   held there is "no presumption against removal jurisdiction [under CAFA] and that CAFA should be

20   read 'with a strong preference that interstate class actions should be heard in a federal court if properly

21   removed by any defendant.'" *Allen v. Boeing Co.*, 784 F.3d 625, 633 (9th Cir. 2015) (alteration in

22   original) (quoting *Dart Cherokee*, 574 U.S. at 89).

23          **B.    Burden of the Removing Party**

24          "The burden of establishing removal jurisdiction, even in CAFA cases, lies with the defendant

25   seeking removal." *Washington v. Chimei Innolux Corp*., 659 F.3d 842, 847 (9th Cir. 2011) (citation

26   omitted).  A defendant seeking removal must file "a notice of removal 'containing a short and plain

27   statement of the grounds for removal….'" *Ibarra v. Manheim Investments, Inc*., 775 F.3d 1193, 1197

28   (9th Cir. 2015) (quoting 28 U.S.C. § 1446(a)).  "When a defendant seeks federal-court adjudication, the

defendant's amount-in-controversy allegation should be accepted when not contested by the plaintiff or questioned by the court. A defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Arias v. Residence Inn by Marriott*, 936 F.3d 920, 924-925 (9th Cir. 2019) (quoting *Dart Cherokee*, 574 U.S. at 87-89 [modifications adopted]). The notice is not required to "contain evidentiary submissions." *Arias*, 936 F.3d at 922 (quoting *Ibarra*, 775 F. 3d at 1197). When a removing defendant shows recovery could exceed $5 million, "and the plaintiff has neither acknowledged nor sought to establish that the class recovery is potentially any less, the defendant has borne its burden to show the amount in controversy exceeds $5 million." *Arias*, 936 F.3d at 927 (internal quotation marks and citation omitted).

Evidence establishing the amount in controversy is required "only when the plaintiff contests, or the court questions, the defendant's allegation." *Dart Cherokee*, 574 U.S. at 89. When the amount in controversy is challenged, "both sides submit proof and the court decides, by a preponderance of the evidence, whether the amount-in-controversy requirement has been satisfied." *Jauregui v. Roadrunner Transp. Servs.*, 28 F.4th 989, 992 (9th Cir. 2022) (citation omitted); *see also Harris v. KM Indus., Inc.*, 980 F.3d 694, 699 (9th Cir. 2020) (indicating that when a calculation is contested, "[b]oth parties may submit evidence supporting the amount in controversy before the district court rules").

The removing party bears the ultimate burden of showing "by a preponderance of the evidence that the aggregate amount in controversy exceeds $5 million when federal jurisdiction is challenged." *Ibarra*, 775 F. 3d at 1197. This burden may be satisfied by submitting "affidavits or declarations, or other 'summary-judgment-type evidence relevant to the amount in controversy at the time of removal,'" *or* by relying upon reasonable assumptions. *Id.*; *LaCross v. Knight Transp. Inc.*, 775 F.3d 1200, 1202 (9th Cir. 2015). Thus, a removing party also "is permitted to rely on 'a chain of reasoning that includes assumptions' to calculate the amount in controversy, and reasonable assumptions "do not necessarily need to be supported by evidence." *Perez v. Rose Hills Co.*, —F.4th—, 2025 WL 811096, at *3, (9th Cir. Mar. 14, 2025) (quoting *Arias*, 936 F.3d at 925); *see also Arias*, 936 F.3d at 925 ("[a]n assumption may be reasonable if it is founded on the allegations of the complaint"). When the calculations *cannot* be justified by the allegations in the complaint—or are "unreasonable" assumptions—the removing party must present evidence to support the assumptions made. *Perez,* 2025

10

1   WL 811096, at *4 (citing *Ibarra*, 775 F.3d at 198).

2   ## C.    Challenges to the Court's Jurisdiction

3   Once removed, a plaintiff may seek remand by making either a "facial" or "factual" attack on

4   the defendant's jurisdictional allegations in the notice of removal. *Harris*, 980 F.3d at 699-700 (citing

5   *Salter v. Quality Carriers*, 974 F.3d 959, 964 (9th Cir. 2020)). "A facial attack accepts the truth of the

6   defendant's allegations but asserts that they are insufficient on their face to invoke federal jurisdiction."

7   *Id.*, 980 F.3d at 699 (internal quotations omitted). For example, challenges as to the form and

8   competency of evidence raise facial challenges. *See Salter*, 974 F.3d at 964. "A factual attack contests

9   the truth of the allegations themselves." *Harris*, 980 F.3d at 699 (modifications adopted). When a

10  plaintiff mounts a factual attack to the removing party's jurisdictional allegations, the burden remains

11  on the removing party to provide "competent proof" and show by preponderance of the evidence that

12  the jurisdictional requirements are satisfied. *Id.* at 701.

13  ## IV.    Evidence in Support of Removal[2]

14  Defendants submitted a declaration from Joy A. Jensen, Payroll Director for Falstaff, LLC.

15  (Doc. 8-1.) Ms. Jensen reported as part of her job duties, she has "access to employee personnel

16  records and electronically-stored employment records Fastaff maintains in the ordinary course of its

17  business for the travelers it has employed since October 2019, including those temporarily assigned to

18  work in California." (*Id.* at 2, ¶ 4.) According to Ms. Jensen, the records maintained by Fastaff

19  include "Assignment Agreement Letters," which "describe the compensation and other terms of each

20  assignment accepted by a traveler, assignment dates, time records, and pay data." (*Id.* at 2-3, ¶¶ 4-5.)

21  She asserts that, "in the ordinary course of its business, Fastaff also "maintains electronic time records

---

23  [2] In the Notice of Removal, Defendants based calculations on employment data through May 27, 2023, noting that

24  "[u]sing data through the time of removal would further increase the amount in controversy." (*See* Doc. 1 at 12, n. 4.) After Plaintiffs filed their motion to remand, Defendants filed declarations with updated data through the date of removal. (*See* Doc. 8-1 at 2, Jensen Decl. ¶ 4.) Because Defendants were not obligated to submit evidence to support

25  jurisdiction until the calculations were challenged, the Court addresses the amended calculations to determine whether removal was proper. *See Serrieh v. Jill Acquisition LLC*, 707 F. Supp. 3d 968, 976 (E.D. Cal. Dec. 2023) (noting the

26  defendant updated its calculation in opposition to the motion to remand, and considering the updated calculations); *see also Cavada v. Inter-Continental Hotels Group, Inc.*, 2019 WL 5677846, at *7 (S.D. Cal. Nov. 1, 2019) (observing

27  that in opposing to remand, the defendants updated their calculations—which involved identifying approximately 1,900 additional non-exempt employees in the relevant period—and considering the updated calculation to evaluate

28  the court's jurisdiction under CAFA).

of the hours worked by its travelers on California assignments" and "electronic payroll records … of the wage and non-wage payments made to travelers for each weekly pay period. (*Id.* at 3, ¶¶ 6, 7.) Ms. Jensen reports:

> For each payment issued to a traveler, the weekly payroll records show a description of the payment (such as, if applicable, straight time, overtime, double-time), the rate at which it was paid, if applicable, the corresponding number of hours worked associated with the payment, if applicable, and the total amount of each payment type.

(*Id.*, ¶ 7.) Thus, the records maintained by Fastaff identify the "position, work location, and hourly rate of pay" for each employee. (*Id.* at 2, ¶ 4.)

Using the personnel and payroll records, Ms. Jensen assisted with preparing "a summary report containing data for all hourly, non-exempt travelers employed on temporary assignments in California from October 20, 2019 through November 25, 2023." (Doc. 8-1 at 2, ¶ 4.) With this data, Ms. Jensen reports that Fastaff employed "2,413 hourly, non-exempt travelers … on one or more temporary assignments in California from October 20, 2019 through November 25, 2023." (*Id.*) She also identified 70 individuals "who worked on assignments in California ended after October 20, 2020, but before September 19, 2023 are coded in the data as no longer employed due to being terminated (39), 'Inactive/Dormant' (30), or deceased (2)." (*Id.*) Fastaff used "each former traveler's actual final hourly rate" to calculate potential damages for wages due to the 70 individuals, which Ms. Jensen determined places $1,322,400 in controversy. (*Id.* at 6, ¶ 12.)

Ms. Jensen notes the Assignment Agreement Letters also indicate whether traveling nurses are "eligible for a housing stipend," which "covers the reasonable housing expenses that a traveler is expected to incur during that travel assignment." (Doc. 8-1 at 3-4, ¶ 8.) She reports that "[t]he housing stipend is not coded as wages" and "does not increase based on the number of hours worked by the traveler, including any overtime worked." (*Id.* at 4, ¶ 8.) Ms. Jensen explains:

> Fastaff does not include, and has not included since October 2019 (and earlier), the amount of the housing stipends paid to travelers in the calculation of their regular rate of pay when paying overtime wages. This means that a traveler does not receive any increased overtime pay as a result of receiving a housing stipend. This has been Fastaff's policy prior to October 20, 2019 and up to the present.

(*Id.*) According to Ms. Jensen, the Fastaff records show "1,989 travelers … worked one or more pay

periods in California in which they received both a payment of overtime wages (time-and-a-half overtime or double-time) and a housing stipend" from October 20, 2019, to November 25, 2023, which totaled 19,343 weekly pay periods.  (*Id.* at 5, ¶ 9.)  Ms. Jensen reports that to calculate the potential overtime and double-time earnings for these 1,989 individuals, Fastaff used their actual housing stipends and actual total hours worked in a week to calculate their theoretical hourly rates, which were then "multiplied by 1.5 to determine the theoretical overtime rate[s]" and "then multiplied by the number of time-and-a-half overtime hours worked during that workweek to calculate the potential theoretical additional time and one-half overtime pay" for each employee.  (*Id.*, ¶ 10.)  Ms. Jensen stated, "For each hour of double-time rate overtime paid to a traveler in the same workweek that a housing stipend was paid to that traveler, the report multiplied the theoretical hourly rate calculated for the housing stipend by 2 and then multiplied that rate by the [actual] number of double-time overtime hours worked during that workweek...."  (*Id.*)  The total with this calculation was $9,012,309.15.[3]  (*Id.*)

Plaintiffs assert that the evidence provided by Defendants "falls far short of the summary-judgment-type evidence Defendants were required to present in support of their overtime calculations . . ."  (Doc. 10 at 6.)  According to Plaintiffs, "to establish the jurisdictional amount under CAFA, employers must disclose their calculation figures."  (*Id.* at 7.)  For example, Plaintiffs observe: "In *Rodriguez v. Circle K Stores Inc*., 2019 U.S.Dist.LEXIS 115701, *13 (C.D. Cal. 2019), the Court reject[ed] the employer's estimate because 'defendant fails to show its work with respect to the claimed damages amount. In other words, defendant does not supply the math it utilized to derive the [estimated] figure...'"  (*Id.*)  In addition, Plaintiffs contend the Ninth Circuit found declaratory evidence from a payroll supervisor was insufficient to support removal because "defendant did not disclose the figures it used to reach its estimates."  (*Id.* at 7, citing *Garibay v. Archstone Communities LLC*, 539 Fed. App'x 763, 764 (9th Cir. 2013).)

Contrary to Plaintiffs' suggestion, courts have declined to find declaratory evidence is *intrinsically* insufficient to satisfy a removing party's burden.  For example, the Ninth Circuit addressed

---

[3] Flastaff also performed an alternative calculation using the actual housing stipends paid and a 40-hour week average. (Doc. 8-1 at 4-5, ¶ 9.)  Using the 40-hour week average, the total amount in controversy is $10,562,245.43.  (*Id.* at 5, ¶ 9.)

the sufficiency of a declaration in *Garibay*. The Court observed that the only evidence the defendants submitted to support removal was "a declaration by their supervisor of payroll, which sets forth only the number of employees during the relevant period, the number of pay periods, and general information about hourly employee wages." *Id.*, 539 Fed. Appx. at 764. Importantly, the Court also noted: "Beyond this, the defendants rely on speculative and self-serving assumptions about key unknown variables." *Id.* The Court observed:

> For example, Garibay alleged violations of Cal. Labor Code § 226, which provides that employers who fail to provide employees with "an accurate itemized [wage] statement" are subject to fines. Archstone's calculations assume that every single member of the class would be entitled to recover penalties for every single pay period. Garibay also alleges violations of Cal. Labor Code § 203, which provides that employers who fail to timely pay all earned wages upon termination are subject to a fine equal to the employee's normal wages for each day the wages are late, up to a maximum of 30 days. Archstone assumes that each employee would be entitled to the maximum statutory penalty, but provides no evidence supporting that assertion. Along the same lines, Garibay alleged violations of Cal. Labor Code § 226.7, which provides that employers who fail to provide adequate meal or rest breaks must compensate the employee for an additional hour of pay. Archstone assumes that each class member was wrongly denied a break twice each week.

*Id.* In addition, the Court specifically noted: "Archstone failed to provide any evidence regarding why the assumption that each employee missed two rest periods per week was more appropriate than one missed rest period per paycheck or one missed rest period per month." *Id.* (internal quotation marks omitted). Thus, the Court considered the declaration *coupled with* the self-serving assumptions regarding the frequency of the alleged violations, and found the "evidence was insufficient to support removal jurisdiction under CAFA." *Id.*

After *Garibay*, the Ninth Circuit held that a declaration may be sufficient evidence to support removal, without additional evidentiary submissions. *See Salter v. Quality Carriers, Inc.*, 974 F.3d 959 (9th Cir. 2020). In *Salter*, the plaintiff filed a putative class action for wage and labor violations, which Quality removed to federal court under CAFA. *Id.* at 961. The district court observed Quality supported its notice of removal with a declaration from Cliff Dixon, its Chief Information Officer, who did not "attach a single business record, spreadsheet, or other supporting document to his declaration to corroborate his testimony." *Salter v. Quality Carriers, Inc.*, 2020 WL 1182581, at *2 (C.D. Cal. Mar. 20, 2020). The district court also noted Dixon's declaration was based on his "review and

understanding of company practices and records," but Dixon did not identify "precisely what these records include or whether he actually reviewed any records before his declaration was drafted." *Id.* The district court found Quality "failed to provide the necessary foundation for its calculations and, thus, have failed to put forth summary-judgment-type evidence necessary to demonstrate its amount in controversy calculations." *Id.* The district court concluded: "The unsupported and conclusory statements in Dixon's declaration are insufficient to establish that the amount in controversy exceeds $5 million." *Id.* (citing *Contreras*, 2017 WL 4457228, at *3; *Rinaldi*, 2017 WL 3406096, at *3.)

On appeal, the Ninth Circuit determined the district court erred in its analysis. *Salter*, 974 F.3d at 963-965. The Court observed:

> According to Salter, Quality failed to meet this [removal burden] by offering only a short declaration by one of its employees and not providing a single business record to support that declaration. He contends that the district court properly rejected the declaration because evidence submitted at summary judgment must satisfy the "best evidence rule," which requires that a party provide "the original of a writing, recording, or photograph" to "prove the contents thereof." Salter argues that because the best evidence rule applies whenever the contents of a document are sought to be proved, a declarant may not simply testify to the contents of a document, he must actually produce the document for it to be considered.

*Id.* at 963-94. The Court observed that Salter made a facial attack against the defendant's jurisdictional assertions, because Salter did not offer any of his own evidence or challenge the rationality of the information, and rather "argued only that Quality 'must support its assertion with competent proof.'" *Id.* The Court found "such a challenge is foreclosed by the Supreme Court's decision in *Dart* and [the Ninth Circuit's] opinion in *Arias*," in which the Court determined "a removing defendant's notice of removal *need not* contain evidentiary submissions but only plausible allegations of jurisdictional elements." *Id.* (quoting *Arias*, 936 F.3d at 922 (emphasis added, internal quotation marks omitted)). Because Salter challenged only the declaration as "competent proof," the Ninth Circuit found the district court erred and vacated the remand order. *Id.*

As in *Salter*, it appears Plaintiffs make a facial attack to the jurisdictional employment information provided by defendant, because they do not present any evidence to challenge the accuracy of the information from Ms. Jensen. *See Salter*, 974 F.3d at 961. Rather, Plaintiffs argue Ms. Jensen's declaration is insufficient to satisfy the "summary-judgment-type evidence" standard to support

removal.  (*See* Doc. 10 at 7.)  These challenges to the form and sufficiency of the evidence presented constitute a facial challenge.  *See Salter*, 974 F.3d at 961; *see also Bulnes v. Suez WTS Servs. USA, Inc.*, 2023 WL 2186431, at *4 (S.D. Cal. Feb. 23, 2023) (explaining that where a plaintiff challenges a declaration as "not competent evidence" and asserts the "failure to provide underlying records is particularly inexcusable since Defendant is an employer," such a challenge is a facial attack, rather than factual) (internal quotation marks omitted).

  *Arias* and *Salter* foreclose Plaintiffs' argument that the declaratory evidence, in itself, is insufficient.  Ms. Jensen reports that she has "access to employee personnel records and electronically-stored employment records Fastaff maintains in the ordinary course of its business for the travelers it has employed since October 2019, including those temporarily assigned to work in California."  (Doc. 8-1 at 2, ¶ 4.)  She also indicates the information provided in her declaration is based upon information from travelers' Assignment Agreement Letters, from which Fastaff created "a summary report containing data for all hourly, non-exempt travelers employed on temporary assignments in California from October 20, 2019 through November 25, 2023," a total of 2,413 individuals.  (*Id.*)  Further, Ms. Jensen reports she has "personal knowledge" of the information in the declaration.  (*Id.*, ¶ 2.)  This information is sufficient.  *See Salter*, 974 F.3d at 963-965; *see also Arrow Elecs., Inc. v. Justus (In re Kaypro),* 218 F.3d 1070, 1075 (9th Cir. 2000) ("Personal knowledge may be inferred from a declarant's position").  Contrary to Plaintiffs' assertion, Ms. Jensen was not required to attach additional evidence to her declaration, such as payroll records and timesheets for each of the 2,413 identified individuals.  *See Salter*, 974 F.3d at 963-965; *Avila v. Rue21, Inc.*, 432 F. Supp. 3d 1175, 1186-87 (E.D. Cal. 2020) (rejecting the plaintiff's argument that a declaration was "*per se* insufficient because it lacks foundation and corroborating documents such as payroll records"); *Hayes v. Salt & Straw, LLC*, 2020 WL 2745244, at *3 (C.D. Cal. May 27, 2020) (rejecting the plaintiff's argument that a declaration from a human resource manager was insufficient "because [the defendant] failed to submit the underlying payroll records").  Toward this end, Defendants were not obligated, at this time, to produce evidence of the actual hourly rates for each of the putative class members.

  The evidence provided by Ms. Jensen—including the number of class members, number of terminated employees, the estimated number of workweeks, and relevant wage statements—is

16

1    sufficient to support an amount in controversy calculation under the "preponderance of the evidence"

2    standard.  *See Sanchez*, 2021 WL 2679057, at *4; *Thompson v. Fastaff, LLC*, 2022 WL 4109450 (C.D.

3    Cal. Sept. 8, 2022) ("the Court's review of relevant authority shows that declarations of employees

4    familiar with the defendant's payroll are sufficient to meet the preponderance standard where, as here,

5    the employee provides some basis for the defendant's assumptions by testifying about the number of

6    employees and qualifying shifts worked").  Plaintiffs' criticisms of the declaratory evidence provided in

7    support of removal are unavailing.

8    **V.     Discussion and Analysis**

9         Plaintiffs request remand to state court, asserting Defendants fail to show the action satisfies the

10   jurisdictional requirements of CAFA.  (*See generally* Doc. 4.)  Defendants oppose remand, and provide

11   additional calculations related to Plaintiffs' claims.  (Docs. 8, 13.)

12        **A.     Diversity of the Parties**

13        As an initial matter, Plaintiffs do not contest the diversity of the parties.  (*See generally* Doc. 4.)

14   Plaintiffs allege that "[a]t all relevant times" Rubel was a resident of Georgia and Malysheva was a

15   resident of Texas.  (Doc. 1-1 at 7, ¶¶ 6-7.)  In addition, Plaintiffs allege that "Defendants U.S. Nursing

16   Corporation and Fastaff, LLC are … Colorado corporations duly authorized to do business in

17   California."  (*Id.*, ¶ 8.)  Accordingly, the Court finds the parties are diverse and this element of CAFA

18   is satisfied.

19        **B.     Number of Class Members**

20        Plaintiffs seek to represent a class defined as: "All of Defendants' non-exempt employees who

21   were assigned to work at any facility inside California during the Class Period, with the exception of

22   non-exempt employees of Defendants who were assigned to work at facilities in California that at the

23   time were engaged in labor disputes."  (Doc. 1-1 at 12, ¶ 29.)  Ms. Jensen reports that based upon

24   Fastaff's records, "2,413 hourly, non-exempt travelers were employed by Fastaff on one or more

25   temporary assignments in California from October 20, 2019 through November 25, 2023."  (Doc. 8-1

26   at 2, ¶ 4.)  Plaintiffs do not dispute that the number of class members exceeds the minimum of 100

27   persons as required by CAFA.  (*See generally* Doc. 4.)  Therefore, the Court finds the class size

28   satisfies this jurisdictional requirement.

### C.     Amount in Controversy

The Ninth Circuit explained that "[t]he amount in controversy is simply an estimate of the total amount in dispute, not a prospective assessment of [the] defendant's liability." *Lewis v. Verizon Communs., Inc.*, 627 F.3d 395, 401 (9th Cir. 2010).  Thus, amount in controversy is not the amount a plaintiff will *likely* recover.  *Chavez v. JPMorgan Chase & Co.*, 888 F.3d 413, 417 (9th Cir. 2018).  Rather, it "reflects the *maximum* recovery the plaintiff could reasonably recover." *Arias*, 936 F.3d at 927 (citing *Chavez*, 888 F.3d at 417) (emphasis in original).  To determine the amount in controversy for CAFA purposes, the claims of individual members in a putative class are aggregated.  28 U.S.C. § 1332(d)(6); *see also Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 595 (2013).

In the Notice of Removal, Defendants assert the amount in controversy requirement is satisfied based upon Plaintiffs' overtime claim, wage statements claim, and the waiting time penalties.  (Doc. 1 at 10-15, ¶¶ 39.)  Plaintiffs dispute the assumptions made to determine the amount in controversy, asserting the calculations are speculative, unreasonable, inflated using 100% violation rates, and unsupported.[4]  (*See* Doc. 4 at 6; *id.* at 9-18.)

### 1.     Overtime claim

Plaintiffs allege that "Defendants, from time to time, failed to pay overtime rates for all overtime hours worked by Plaintiffs and other non-exempt employees."  (Doc. 1-1 at 9, ¶ 15.)  In addition, Plaintiffs assert Defendants "had a practice of failing to include the value of their 'travel stipends,' …, whether paid in cash or in kind, in Plaintiffs' and other non-exempt employees' regular rates of pay when calculating overtime or double time wages."  (*Id.*, ¶ 17; *see also id.* at 15, ¶ 39.)  Plaintiffs contend the practice of not including the travel stipends to calculate overtime pay rates was a "violation of California law."  (*Id.*, ¶ 18.)  For this, Plaintiffs seek to recover unpaid overtime compensation pursuant to California Labor Code §§ 200, 203, 218.5, 226, 558 and 1194.  (*Id.* at 15, ¶ 41.)  The California Labor Code requires employers to pay employees who work more than eight hours in a day, or forty hours in a week, at a "rate of no less than one and one-half times the regular rate of pay for an employee."  Cal. Lab. Code § 510(a).  Defendants assert this claim puts at least

---

[4] Toward this end, the Court notes Plaintiffs also raise a factual attack as to the jurisdictional assertions made by Defendants.  *See Harris*, 980 F.3d at 700.

18

1    $3,494,395.40 in controversy.  (Doc. 13-1 at 5, citing Jensen Supp. Decl. ¶¶ 3-4 [Doc. 13-2 at 3].)

2                    *a.      Objections to use of a 100% violation rate*

3            Plaintiffs objected to the use of "a 100% violation rate" by Defendants for purposes of

4    calculating the amount in controversy for the overtime claim.  (Doc. 4 at 10.)  However, Defendants did

5    not use "a 100% violation rate" to calculate the amount in controversy for the overtime cause of action.

6    Plaintiffs seek to represent a class including "[a]ll of Defendants' non-exempt employees who were

7    assigned to work at any facility inside California during the Class Period…."  (Doc. 1-1 at 12, ¶ 29.)

8    Defendants report Falstaff had a "policy prior to October 20, 2019 and up to the present" to not include

9    "the amount of the housing stipends paid to travelers in the calculation of their regular rate of pay when

10   paying overtime wages."  (Doc. 8-1 at 4, Jenson Decl. ¶ 8.)  Based upon this policy, Defendants

11   identified a narrowed subset from the putative class and calculated the damages *only* for class members

12   who received stipends and whose overtime pay was affected by the challenged policy.  Specifically,

13   Defendants calculated the damages for "1,989 travelers who worked at least one assignment in

14   California from October 20, 2019 through November 25, 2023 where they received a weekly housing

15   stipend" and received overtime pay.  (Doc. 13-2 at 3-4, Jensen Supp. Decl. ¶ 4 [emphasis added]; *see*

16   *also* Doc. 1 at 12, ¶ 28.)  Because Defendants did not calculate damages for the *entire* putative class—

17   which includes more than 2,400 individuals (Doc. 8-1 at 2, ¶ 4)—and instead limited the calculation to

18   *only* the nurses identified as affected by the challenged policy, Plaintiffs' objection regarding use of "a

19   100% violation rate" is unavailing.

20                    *b.      Objections to calculations using a 40-hour workweek*

21           Initially, Defendants calculated overtime rates by assuming a 40-hour workweek for each of

22   the identified nurse travelers.  (*See* Doc. 1 at 12, ¶ 28.)  After Plaintiffs objected to the use of a 40-hour

23   week (Doc. 4 at 13-14), Defendants recalculated the overtime rates for each individual using both the

24   40-hour pay and, in the alternative, the "actual hours worked (non-overtime and overtime hours) in

25   each week in which a housing stipend was paid."  (Doc. 8 at 14-15, citing Jensen Decl. ¶¶ 9-10 [Doc.

26   8-1 at 4-5].)  Plaintiffs indicated they "agreed to use actual hours worked as the denominator for

27   estimating overtime damages."  (Doc. 10 at 6.)  Accordingly, the final calculation from Defendants

28   uses the actual "total hours worked by each traveler in that week, instead of using 40 hours" to

                                                        19

1   determine the applicable overtime rates.  (Doc. 13-2 at 3-4, Jensen Supp. Decl. ¶ 4.)  Because the

2   Court relies upon the final calculation (of $3,494,395.40) to determine whether the amount in

3   controversy is satisfied—rather than any of the prior/alternative calculations—Plaintiffs objections

4   related to calculations with the 40-hour workweek are disregarded.

5                        *c.*      *Multipliers for overtime rates*

6             As discussed above, Plaintiffs argued in their reply brief that Defendants made "a fatal error" in

7   calculating overtime damages, because "Defendants use the wrong multiplier of 1.5 to calculate unpaid

8   overtime and the wrong multiplier of 2 to calculate unpaid double time."  (Doc. 10 at 2; *see also id.* at

9   3-6.)  Plaintiffs observed that "when using an actual-hours-worked denominator (as is done for

10  overtime calculations not involving flat-sum bonuses) requires using a .5 multiplier to reach the unpaid

11  overtime amount and a 1 multiplier to reach the unpaid double time amount."  (*Id.* at 4, citing *Marin v.*

12  *Costco Wholesale Corp*., 169 Cal. App. 4th 804, 816 (2008).)  As Plaintiffs observe, in *Marin*, the court

13  determined that "the 0.5 multiplier correctly produces an hourly overtime rate of pay that is 1.5 times

14  the hourly regular rate of pay."  *Marin*, 169 Cal. App. 4th at 817.  In addition, Plaintiffs observe that

15  "the Ninth Circuit held that the proper multipliers for actual-hours-worked denominator calculations are

16  .5 for owed overtime payments and 1.0 for owed double time payments."  (*Id.*, citing *Bowen v. Target*

17  *Corp*., 2022 U.S. App. LEXIS 30291, 2022 WL 16570815 (9th Cir. 2022).)  Therefore, Plaintiffs

18  asserted Defendants should have applied the multipliers of 0.5 to determine unpaid overtime rates and

19  1.0 to determine the double-time rates.  (*Id.* at 4-6.)

20            In response, Ms. Jensen reports that Defendants recalculated the amount in controversy using

21  the 0.5 multiplier for overtime and 1.0 for the double-time rate as argued by Plaintiffs.  (Doc. 13-2 at

22  3-4, Jensen Supp. Decl. ¶ 4.)  Ms. Jensen explains:

23            For each workweek that a housing stipend was paid to that traveler and
             the traveler worked overtime, the theoretical hourly rate calculated for
24           the housing stipend using this total weekly hours calculation was then
             multiplied by .5 (instead of 1.5 as discussed in my prior Declaration) to
25           determine the theoretical overtime rate which was then multiplied by the
             number of time-and-a-half overtime hours worked during that workweek
26           to calculate the potential theoretical additional time and one-half
             overtime pay for that employee if, under Plaintiffs' theory, the housing
27           stipend was included to calculate and pay the overtime rate. For each
             hour of double-time rate overtime paid to a traveler in the same
28           workweek that a housing stipend was paid to that traveler, the report
             multiplied the theoretical hourly rate calculated for the housing stipend

                                              20

by 1.0 (instead of 2.0 as discussed in my prior Declaration) and then multiplied that rate by the number of double-time overtime hours worked during that workweek to calculate the potential theoretical additional double-time overtime pay for that employee if, under Plaintiffs' theory, the housing stipend was included to calculate and pay the overtime rate.

(*Id.*)  Ms. Jensen reports the amounts for each of the 1,989 travelers were added together, and the total amount calculated was $3,494,395.40. (*Id.* at 4, ¶ 4.)  This amount included $3,133,177.49 using the 0.5 multiplier (for overtime) and $361,217.91 using the 1.0 multiplier (for double-time).  (*Id.*)

> ### d.    Final calculation

Based upon the employment data identified by Ms. Jensen and Defendants' use of the actual hours worked by affected employees—coupled with the amended multipliers of 0.5 and 1.0 to determine the overtime and double overtime rates—the Court finds the Defendants' calculations comply with the applicable legal standards.  *See Ibarra*, 775 F. 3d at 1197, 1199; *see also Arias*, 936 F.3d at 925.  Consequently, Defendants establish by a preponderance of the evidence that Plaintiffs' overtime claim places $3,494,395.40 in controversy.

> ### 2.    Wage statement penalties

Plaintiffs' seventh cause of action is for "failure to furnish accurate wage statements" in violation of California Labor Code § 226(a).  (Doc. 1-1 at 20 [emphasis omitted].)  Section 226(a) requires that each employer furnish employees with an "accurate itemized wage statement in writing" with information such as gross wages earned, total hours worked by an employee, the number of hours worked at each hourly rate, all deductions, net wages earned, and identifying information of the employee and the employer.  Cal. Lab. Code § 226(a).  Under Section 226, if an employer provides an inaccurate or incomplete wage statement, employees may be entitled to recover actual damages or $50 for the initial pay period in which a violation occurs and $100 "for each violation in a subsequent pay period," not to exceed $4,000.  Cal. Lab. Code § 226(e)(1).  The statute of limitation for wage statement penalties is one year.  *See* Cal. Code. Civ. Proc. § 340.

Plaintiffs allege the wage statements received "from time to time" included inaccurate information that was required under Section 226(a).  (Doc. 1-1 at 20, ¶ 74.)  Plaintiffs also incorporate all prior allegations, including those related to failure to pay overtime wages, all hours worked, and

minimum wages.  (*See id.*, ¶ 71; *see also id.* at 14-20.)  Defendants considered the statutory penalty amounts for these violations, the one-year statute of limitations, the number of employees in the putative class, and the number of wage statements.  Specifically, Defendants determined that between October 20, 2022 through November 25, 2023, "489 travelers who worked an assignment in California received an aggregate total of 4,656 weekly wage statements reflecting the payment of overtime (time and one-half and/or double-time) wages and a housing stipend in the same pay period."  (Doc. 8-1 at 5-6, Jensen Decl. ¶ 11.)  In addition, Defendants indicated nine of the individuals "received more than 40 of such wage statements during this time period."  (*Id.* at 6, ¶ 11.)  Ms. Jensen reports:

> Using the exact number of these wage statements for each of the 480 travelers who did not receive more than 40 during this time period, but only allotting 40 wage statements to the nine travelers who received more than 40, I assigned a $50 value to the first wage statement for each traveler and a $100 value to each wage statement after the first for each travel nurse.

(*Id.*)  Defendants report this results in $437,800 in controversy for wage statement violations.  (*Id.*)

Plaintiffs argue that Defendants' calculation was improper because Defendants could not assume a "maximum wage statement violation rate"—or a 100% violation rate—based on allegations that an employer violated the statute "from time to time."  (Doc. 4 at 17, citing *Gomez v. Metro Air Serv.*, 2023 U.S. Dist. LEXIS 21709 at *20, 2023 WL 1822373 (C.D. Cal. Feb. 7, 2023), *Cummings v. G6 Hospitality, LLC*, 2019 U.S. Dist. LEXIS 56719 at *3, 2019 WL 1455800 (S.D. Cal. Apr. 9, 2019); *Sanders v. Old Dominion Freight Line, Inc.*, 2017 U.S. Dist. LEXIS 15936 at *13-14, 2017 WL 5973566 (S.D. Cal. Feb. 2, 2017).)  In addition, Plaintiffs argue that Defendants erred in calculating the amount in controversy by using the "$100 penalty for each employees' subsequent wage statements" because "Plaintiffs do not claim that Defendants were notified of any Labor Code violation prior to this action."  (*Id.* at 17-18, citing *Perez v. WinnCompanies, Inc.*, 2014 U.S. Dist. LEXIS 158748, 2014 WL 5823064 (E.D. Cal. Nov. 10, 2014).)

           *a.*      *Use of a 100% violation rate*

As Plaintiffs observe, courts determined calculating the amount in controversy with a maximum violation rate is not appropriate when it is unsupported by allegations in the complaint or evidence.  For example, in *Gomez* the court found a 100% violation rate was not proper where the plaintiff alleged "he and other employees were not compensated with all their wages lawfully due in that . . . they were from

22

time to time: unable to take their meal and rest breaks or required to work while clocked out during their breaks; not provided complete and accurate wage statements; and not timely paid their correct wages." *Id.*, 2023 WL 1822373, at *1. The defendant identified 1,448 employees within the applicable one-year limitations period and multiplied the number of employees "by 26 pay periods and by the $100 penalty for each inaccurate workweek." *Id.* at *6. Defendant then added "the calculation of the initial pay period penalty, 1448 employees times $50." *Id.* The court observed that while the defendant assumed 26 wage statements over the course of a year, there was "no evidence in the record as to how long defendant's pay periods were, or how many wage statements were issued to the 1448 employees." *Id.* The court found, "Without any basis for determining the number of statements at issue, it is impossible to calculate the amount of wage statement penalties in controversy." *Id.* In addition, the court found no basis "to assume at least one violation for each employee for each pay period given the allegations … [that] defendant failed to provide employees with accurate wage statements from 'time to time.'" *Id.* Therefore, the *Gomez* court rejected the use of "a 100% violation rate" and found the "asserted amount in controversy for this claim does not support [the] removal of this case." *Id.* at *6-7.

Similarly, in *Cummings*, the Southern District court found the defendants erred in applying a 100% violation rate for a wage statement claim where the calculation was unsupported by the plaintiff's allegations or the defendants' records. *Id.*, 2019 WL 1455800, at *3-4. The court observed:

> First, Plaintiff's allegations of violations under section 226 are qualified to "*[w]hen* Plaintiff and other California Class Members worked overtime in the same pay period they earned incentive wages and/or missed meal and rest breaks." [Citation.] Secondly, Plaintiff only alleges that "*from time to time* Defendants provided Plaintiff and the other members of the California Class with wage statements which violated Cal. Lab. Code § 226."

*Id.* at *3 (citation omitted, emphasis in original). The court found "a 100% violation rate" was unreasonable because it hinged upon two "flawed assumptions: (1) every single employee during the statutory period had at least two inaccurate wage statements; and (2) every single employee terminated during the statutory period was a full-time employee who "worked overtime in the same pay-period they earned incentive wages and/or missed meal and rest breaks." *Id.* at *4. In addition, the court found the defendants "introduced no evidence that the 100% violation rate is reasonable given its own records." *Id.* Therefore, the court determined "the utilization of a 100% violation rate to calculate the

23

putative class's monetary recovery on the wage statement penalty claim is 'not grounded in real evidence.'" *Id.* (quoting *Ibarra*, 775 F.3d at 1199).

Finally, in *Sanders*, the Southern District court again determined that "[a]n allegation that a violation occurred 'from time to time' does not support the use of a 100% violation rate." *Id.*, 2017 WL 5973566, at *7. Specifically, Sanders alleged the defendant "uniformly and systematically fail to provide and record all the legally required unpaid, off-duty meal periods and all the legally required paid, off-duty rest periods to' Sanders and class members, and that … 'policy and practice' resulted in the meal and rest break violations." *Id.* at *3. The court observed that "uniform" policy related to meal and rest breaks did "not necessarily mean that a violation occurred every single day that the employee worked." *Id.* at *4. Towards this end, the court determined the defendant could not assume a 100% violation rate for "wage statements that did not include an itemization of meal and rest break payments." *Id.* at *5. The court explained: if a class member "did not miss any meal or rest breaks during a pay period, presumably he would not have received any payments for such meal or rest breaks and there would have been no basis for itemizing such payments on the wage statement." *Id.* Thus, the court found the violation rate was not based upon a reasonable assumption. *Id.*

Significantly, each of the cases cited by Plaintiff should be distinguished from the matter now before the Court. Although Plaintiffs also allege violations occurred "from time to time," that is where the pleading and evidentiary similarities end. Unlike in *Gomez*, *Cummings*, and *Sanders*—in which the wage statement violations rested upon other underlying wage and hour violations that occurred "from time to time"—Defendants present declaratory evidence admitting the challenged stipend payment was a *policy*, under which "a traveler does not receive any increased overtime pay as a result of receiving a housing stipend." (Doc. 8-1 at 4, Jensen Decl. ¶ 8.) Defendants also did not simply identify *all* non-exempt employees during the statutory period—as the defendants did in *Gomez* and *Cummings*—but instead used employment records to identify *only* the 489 employees affected by the challenged policy during the relevant period. (*See id.* at 5-6, ¶ 11; *compare with Cummings*, 2019 WL 1455800, at *3-4 [assuming "every single employee" suffered a violation].) Defendants also did not rely simply upon speculation regarding pay periods but identified "4,656 weekly wage statements reflecting the payment of overtime (time and one-half and/or double-time) wages and a housing

stipend in the same pay period."  (*Id.*; *compare with Gomez*, 2023 WL 1822373, at *6 [finding no evidence regarding "the number of statements in issue"]; *Cummings*, 2019 WL 1455800, at *3-4 [criticizing the defendants for not using "its own records" to support the assumption that every employee "received two non-compliant wage statements"].)  Defendants carry the burden to present evidence supporting their calculation, which was tethered to the allegations of the complaint and narrowed to *only* those affected by the challenged stipend payment policy and the affected wage statements.  Plaintiffs' objections related to the use of a 100% violation rate are unavailing.

### *b.    Heightened penalties*

Under Section 226, if an employer provides an inaccurate wage statement, employees may be entitled $50 for the initial violation and $100 "for each violation in a subsequent pay period," not to exceed $4,000.  Cal. Lab. Code § 226(e)(1).  Plaintiffs contend Defendants erred in applying the heightened $100 penalties for wage statement violations after the initial violation because they "do not claim that Defendants were notified of any Labor Code violation prior to this action."  (Doc. 4 at 18.)  Plaintiffs observe that in *Perez v. WinnCompanies*, this Court stated:

> "[T]he word "subsequent" has a specific meaning under the California Labor Code. "Until the employer has been notified that it is violating a Labor Code provision ...the employer cannot be presumed to be aware that its continuing underpayment of employees is a 'violation' subject to penalties." *Amaral v. Cintas Corp. No. 2*, 163 Cal. App. 4th 1157, 1209, 78 Cal. Rptr. 3d 572 (2008). "However, after the employer has learned its conduct violates the Labor Code, the employer is on notice that any future violations will be punished just the same as violations that are willful or intentional—i.e., they will be punished at twice the rate of penalties that could have been imposed or that were imposed for the initial violation." Id.
> Defendants' calculations are based upon the assumption that Plaintiff is entitled to the enhanced rate for "subsequent" violations for 25 of the 26 pay periods. However, Plaintiff does not assert that Defendants were notified any Labor Code violations prior to the filing of this lawsuit. Consequently, the Court cannot presume that Defendants were aware of the violations subject to the enhanced penalties.

(Doc. 4 at 17-18, quoting *Perez*, 2014 U.S. Dist. LEXIS 158748, at *17-18.)  Notably, in *Perez*, this Court evaluated whether an individual satisfied the amount-in-controversy requirement for diversity jurisdiction.  Although this Court applied *Amaral* to find notice was required in *Perez*, it later performed a thorough review of the language used in Section 226(e)—which neither *Amaral* nor *Perez* discussed— and determined notice of Labor Code violations is *not* required to apply the heightened

penalty when evaluating whether the jurisdictional requirements of CAFA are satisfied.  *See, e.g., Garnett v. ADT LLC*, 74 F. Supp. 3d 1332, 1334-1336 (E.D. Cal. 2015); *Rivera v. AgReserves*, 2023 WL 5202575, at *8-9 (E.D. Cal. Aug. 14, 2023).

In *Garnett*, the Court reviewed the plain language of Section 226(e) and found that it differed from the Labor Code provisions addressed by *Amaral*, Sections 210 and 255.5.  The Court observed:

> [It is] significant that sections 210, 225.5, and 2699 use the term "subsequent" in a different way than section 226(e). The term "subsequent" in those sections modifies the word "violation," so that a defendant faces enhanced penalties "for each *subsequent violation*."[] The *Amaral* court thus reasoned that an initial "violation" could encompass multiple failures to pay an employee under sections 210 and 225.5.  *See Amaral*, 163 Cal.App.4th at 1209, 78 Cal.Rptr.3d 572 (noting that "each failure to pay each employee" may have "occurred in an initial violation").
>
> This contrasts with section 226(e)'s use of the term "subsequent" to modify the noun "pay period," so that enhanced penalties apply "per employee for *each violation* in a *subsequent pay period*." Cal. Lab.Code § 226(e) (emphasis added). It is not at all clear that the Amaral court would have interpreted this language the same way it interpreted the language of sections 210 and 225.5.  In fact, one of the parties in *Amaral* argued that sections 210 and 225.5 should be distinguished from "examples of other statutes that expressly impose penalties 'per pay period,' " *see Amaral*, 163 Cal.App.4th at 1208, 78 Cal.Rptr.3d 572 (citing Cal. Lab. Code § 2699(f)(2)), but the court's opinion leaves ambiguous whether the court agreed with that understanding.
> …
> Notably, section 226(e) does not contain the phrase "willful or intentional violation." Instead, the statute predicates all liability upon a "knowing and intentional failure by an employer to comply with subdivision (a)." Cal. Lab. Code § 226(e).

*Garnett*, 74 F. Supp. 3d at 1335-36.  Given the difference in the language used in Section 226(e), the Court found *Amaral*—and thus, *Perez*—should be distinguished.  *Id.* at 1336.  Instead, the Court found that under Section 226(e)(1) a defendant "faces a $50 penalty for each violation in an initial pay period, and a $100 penalty per employee for each violation that occurs in a pay period after the initial pay period."  *Id.*; *see also Rivera*, 2023 WL 5202575, at *8-9 (agreeing with the reasoning of *Garnett* and permitting the defendant to use a $50 penalty for initial wage statement violations and a $100 penalty for "subsequent" pay periods).

Having performed this thorough review of the plain language used in Section 226(e)(1), the Court continues to agree the provision requires the heightened $100 penalty for every pay period that

occurs chronologically after the initial pay period in which the employer fails to comply with Section 226(a), regardless of whether the employer received notice that the conduct violated the Labor Code. *See Garnett*, 74 F. Supp. 3d at 1335-36; *Rivera*, 2023 WL 5202575, at *8-9. Accordingly, Defendants did not err in applying the heightened penalty rate to the "subsequent" violations to calculate the amount in controversy for the claim.

<em>c.</em>   <em>Conclusion</em>

As noted above, Ms. Jensen reports Defendants identified "489 travelers who worked an assignment in California received an aggregate total of 4,656 weekly wage statements reflecting the payment of overtime (time and one-half and/or double-time) wages and a housing stipend in the same pay period." (Doc. 8-1 at 5-6, Jensen Decl. ¶ 11.) Thus, there are 489 violations that apply the $50 penalty, and the remaining 4,167 wage statements could be subject to the $100 heightened penalty. This would total $441,150. However, Ms. Jensen reports she identified nine travel nurses who "received more than 40 of such wage statements." Given the limitation of $4,000 per employee under Cal. Lab. Code § 226(e)(1), Ms. Jensen adjusted the number to "only alot[] 40 wage statements to the nine travelers." (*Id.* at 5, ¶ 11.) With this adjustment, the amount in controversy for the wage statements penalties is $437,800. (*Id.*) The Court finds this amount is supported by reasonable assumptions and a preponderance of the evidence.

3.   Waiting time penalties

Plaintiffs seek waiting time penalties for wages due as their ninth cause of action. (Doc. 1-1 at 21.) Under California Labor Code sections 201(a) and 202(a), discharged employees are generally entitled to receive all wages owed immediately on termination, while resigned employees generally receive payment within 72 hours. If an employer fails to timely pay wages due upon termination, then the aggrieved employee is entitled to waiting time penalties "from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days." Cal. Lab. Code § 203(a).

In the complaint, Plaintiffs allege that "Rubel and some members of the Class have separated from Defendants as a result of being discharged or having voluntarily resigned their employment" during the relevant period. (Doc. 1-1 at 21, ¶ 80.) Plaintiffs contend that "Defendants failed to pay all

27

wages due to Plaintiff Rubel and some of the members of the Class who separated from Defendants." (*Id.*, ¶ 81.)  Plaintiffs assert, "Defendants are required to compensate these employees for all their unpaid wages earned and an additional penalty equal to the daily earnings of such employees up to an amount equal to those owed for 30 days of work."  (*Id.*)  Plaintiffs also indicate: "Rubel does not allege that all separated members of the Class are owed waiting time penalties or that they are owed the full 30-day penalty under Labor Code § 203, because it is unknown to … Rubel at this time whether Defendants paid some of the separated members of the Class all of their owed wages upon separation or paid them all their owed wages less than 30 days after their separation."  (*Id.*)

Ms. Jensen reports she identified 71 non-exempt employees "who worked on assignments in California ended after October 20, 2020, but before September 19, 2023," and are "no longer employed due to being terminated (39), 'Inactive/Dormant' (30), or deceased (2)."  (Doc. 8-1 at 2, Jensen Decl. ¶ 4.)  Ms. Jensen reports that "Fastaff did not issue any payments for overtime to these former employees that factored into the regular rate their receipt of a housing stipend during their employment or after the end of their employment."  (*Id.*)  Accordingly, assuming each is entitled to penalties for 30 days—and using "each former traveler's actual final hourly rate"—this puts $1,322,400 in controversy.  (*Id.* at 6, ¶ 12.)

### a. *Plaintiffs' challenge to the calculation*

As with the other causes of action, Plaintiffs contend Defendants erred with the "across-the-broad (sic) violation rate" used to calculate the damages in controversy for waiting time penalties. (Doc. 4 at 15.)  Plaintiff notes that Eastern District rejected calculations assuming the maximum penalties calculations.  (*Id.* at 15-16, citing *Emmons v. Quest Diagnostics Clinical Labs., Inc.*, 2014 U.S. Dist. LEXIS 18024, 2014 WL 584393 (E.D. Cal. Feb. 11, 2014); *Page v. Luxottica Retail N. Am., Inc.*, 2015 U.S. Dist. LEXIS 26624, 2015 WL 966201 (E.D. Cal. Mar. 3, 2015); *Mann v. Altec Indus.*, 2020 U.S. Dist. LEXIS 67183, 2020 WL 1888975 (E.D. Cal. 2020).)

Importantly, Plaintiff's reliance upon *Emmons* and *Page* appears misplaced, as both cases cited *Garibay v. Archstone Communities, LLC*, 539 Fed. Appx. 763 (9th Cir. 2013) to support the rejection of a 100% violation rate.  *See Emmons*, 2014 WL 584393 at *5-6; *Page*, 2015 WL 966201 at *4-5. However, because the Ninth Circuit did not discuss the allegations of the complaint, courts have since

determined the *Garibay* analysis "is of limited utility."  *See, e.g., Herrera v. Carmax Auto Superstores Cal., LLC*, 2014 WL 12586254, at *3 (C.D. Cal. June 12, 2014) ("*Garibay* is of limited utility here because it contains little discussion of the allegations of the complaint…"); *Rivera v. Jeld-Wen, Inc.*, 2022 WL 3702934, at *5 (S.D. Cal. Feb. 4, 2022) (same).  The defendant in *Garibay* assumed "*each* employee would be entitled to the maximum statutory penalty," and did not appear to limit the waiting time penalties to former employees.  *Garibay*, 539 Fed. Appx at 764 (emphasis added).  Unlike in *Garibay*, Defendants' assumption of the maximum waiting time penalties was limited to *former* employees, and the assumption is not inconsistent with Plaintiffs' allegations.  Consequently, *Garibay* may be distinguished.  *See, e.g., Garza v. Brinderson Constructors, Inc.*, 178 F. Supp. 3d 906, 912 (N.D. Cal. 2016) (holding *Garibay* is distinguishable and a defendant need not produce evidence if allegations in the complaint support the maximum statutory penalty).

Moreover, the decision in *Emmons* was issued the Supreme Court issued its opinion in *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81 (2014), and before the Ninth Circuit issued its opinion in *Ibarra v. Manheim Investments, Inc.*, 775 F.3d 1193 (9th Cir. 2015).  The Ninth Circuit summarily vacated the *Emmons* decision cited by Plaintiffs here and remanded the matter "because the district court did not have the benefit of this intervening authority."  *Quest Diagnostics Clinical Laboratories, Inc. v. Emmons*, 2015 WL 14020609, at *1 (9th Cir. Mar. 25, 2015) (citing *United States v. Hooton*, 693 F.2d 857, 858 (9th Cir. 1982)).  Although *Page* was issued after both *Dart Cherokee* and shortly after *Ibarra*, the Court did not address the either of the decisions, which clarified how a removing party may satisfy its burden to establish the jurisdictional amount in controversy under CAFA.  *See Dart Cherokee*, 574 U.S. at 89; *Ibarra*, 775 F. 3d at 1197.  For this reason, the Court finds *Emmons* and *Page* are not instructive.

Finally, the matter now pending must be distinguished from *Mann*, where the Court found the defendant "ignore[d] the allegations in plaintiff's complaint" and the calculations provided were "ill-founded and overstated."  *Id.*, 2020 WL 1888975, at *2.  For example, the Court observed that while the plaintiff alleged "non-exempt employees were not properly paid at the correct overtime rate for all hours worked in excess of eight hours per shift because defendant failed to include non-discretionary Production and Attendance bonuses," the defendant "assumed that all 397 putative class member wages

were not paid any overtime wages at all, *rather than using plaintiff's theory* that the overtime pay did not properly take bonuses into consideration." *Id.* (quotation marks omitted, modifications adopted) (emphasis added). The Court observed that defendant presumably was aware of "how overtime wages were calculated and the actual rate paid, and could have used those figures in its estimation." *Id.* The evidentiary deficiency identified in *Mann* is not present here, where Defendants adopted Plaintiffs' theory of the case that the housing stipends were not properly applied to overtime pay as "a practice" (Doc. 1-1 at 9-10, ¶ 17), and Defendants narrowed the identified number of employees to those affected by the challenged practice. Furthermore, Defendants also used the "actual final hourly rates" paid and used this information to calculate the amounts in controversy. (*See* Doc. 8-1 at 6, Jensen Decl. ¶ 12.)

### b. Use of 100% violation rate

From the face of the complaint, Plaintiffs' claim for waiting time penalties is derivative of their other claims, in which they allege the "past and ongoing unlawful practices and policies" including overtime wages, minimum wages, meal break, rest break, and wage statement violations. (*See* Doc. 1-1 at 6, ¶¶ 1-2.) Notably, this Court previously observed that when a practice of wage and hour violations is alleged, "the recovery of waiting time penalties does not hinge on the number of violations committed; rather Defendants need only have caused and failed to remedy *a single violation* per employee for waiting time penalties to apply." *Demaria v. Big Lots Stores – PNS, LLC*, 2023 WL 6390151, at *7 (E.D. Cal. Sept. 29, 2023) (internal quotation marks, citation omitted) (emphasis added). In *Demaria*, the plaintiff alleged the defendants had "a practice and policy" of wage and hour violations, including overtime, meal break, and rest break violations. *Id.,* 2023 WL 6390151, at *5-6. Given the alleged "practice and policy" of violations, the Court found it was "reasonable to assume all or nearly all employees in the class would be entitled to recovery of waiting time penalties." *Id.* at *7 (citing *Cavada v. Inter-Continental Hotels Grp*., 2019 WL 5677846, at *9 (S.D. Cal. Nov. 1, 2019).)

Likewise, the Central District determined that when a waiting time claim is derivative of other labor code violations on behalf of a class, a 100% violation rate is appropriate for former employees. *Wilcox v. Harbor UCLA Med. Ctr. Guild, Inc.*, 2023 WL 524626 (C.D. Cal. Aug. 14, 2023). In *Wilcox*, the plaintiff brought her wage and hour claims—which included meal and rest break violations, overtime wages, minimum wages, and waiting time penalties— on behalf of a class including "*all*

current and former non-exempt employees of Defendants within the State of California at any time commencing four (4) years preceding the filing of [her] complaint up until the time that notice of the class action is provided to the class." *Id.*, 2023 WL 524626, at \*4 (emphasis in original).  The court observed that a "former employee need only suffer *one* of the alleged violations *at any time* during employment to bring a claim for failure to timely [pay] wages upon termination." *Id.* (emphasis added).  "In other words, any failure to pay overtime, minimum wages, rest period premiums, meal premiums, or uniform reimbursements would result in all terminated or resigned employees not receiving all wages owed…." *Id.*  Thus, the court found it was "reasonable to assume that … 100% of former employees suffered derivative waiting time violations." *Id.* (citation omitted).

As in *Wilcox*, Plaintiffs seek to represent a class that includes "former and current workers of Defendants," including "[a]ll of Defendants' non-exempt employees who were assigned to work at any facility inside California during the Class Period, with the exception of non-exempt employees of Defendants who were assigned to work at facilities in California that at the time were engaged in labor disputes." (Doc. 1-1 at 6, ¶ 1; *Id.* at 12, ¶ 29.)  In addition, Plaintiffs tethered the waiting time penalties to the other claims, including the overtime claim for which she alleged Defendant engaged in "a practice" of violations. (*See id.* at 9-10, ¶¶ 17-18.)  As a result, any former employee of Defendant need only suffer a single violation—whether overtime wages, meal break, rest break, *or* minimum wages—to be entitled to the waiting time penalties. *See Demaria*, 2023 WL 6390151, at \*7.  Thus, the Court concludes the assumption of a 100% violation rate is reasonable because it is limited to the former employees and consistent with the allegations in the complaint. *See Demaria*, 2023 WL 6390151, at \*7; *Wilcox*, 2023 WL 524626, at \*4; *see also Salonga v. Aegis Senior Cmtys., LLC*, 2022 WL 1439914, at \*4 (N.D. Cal. May 6, 2022) (observing courts have accepted a 100-percent violation rate" when the plaintiffs (1) "tied waiting-time penalties to other claims" and (2) the defendant accounts for only its former employees in calculating the penalties) [collecting cases].

Based upon the employment data identified by Ms. Jensen related to the former employees who departed during the relevant period, and the reasonable assumed violation rate tethered to the allegations of the complaint, Defendants show by a preponderance of the evidence that Plaintiffs' claim for waiting time penalties places $1,322,400 in controversy.

1      4.      Attorneys' fees

2          Plaintiffs' final challenges involve the calculation of future attorneys' fees.   (*See* Doc. 4 at 18;

3   Doc. 10 at 11.)  In the sur-reply, following modification of the overtime wages calculation, Defendants

4   indicate potential attorneys' fees are $983,048.75.  (Doc. 13-1 at 5.)  It is well-established that

5   defendants may include a reasonable estimate of attorneys' fees for purposes of estimating the amount

6   in controversy when—as here—the plaintiffs' claims arise under a fee-shifting statute. *Arias*, 936 F.3d

7   at 927 (noting that California wage and hour laws include provisions for a prevailing plaintiff to

8   receive attorneys' fees), citing *Fritsch v. Swift Transp. Co. of Ariz.*, 899 F.3d 785, 794 (9th Cir. 2018).

9   Regardless, because the Court finds Defendants established the amount in controversy exceeds

10  $5,000,000 without including attorneys' fees, the Court need not address the estimated fees.

11  **VI.     Conclusion and Order**

12         For the reasons set forth above, the Court finds Defendants carry the burden to show by a

13  preponderance of the evidence the Court has jurisdiction over the matter pursuant to the Class Action

14  Fairness Act.  Thus, the Court **ORDERS**:

15         1.      Defendants' request for leave to file a sur-reply (Doc. 13) is **GRANTED**.

16         2.      Plaintiffs' motion to remand the case to Kern County Superior Court (Doc. 4) is

17                 **DENIED**.

18

19

IT IS SO ORDERED.

20

21    Dated:   **March 24, 2025**

                                                    UNITED STATES DISTRICT JUDGE
22

23

24

25

26

27

28